## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Dwayne McCoy (R-51451), | ) | |
| | ) | |
| McCoy, | ) | |
| | ) | Case No. 20 C 2708 |
| v. | ) | |
| | ) | Hon. Franklin U. Valderrama |
| | ) | |
| David Gomez, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Dwayne McCoy (McCoy), a prisoner at the Sheridan Correctional Center, brings this *pro se* habeas corpus action pursuant to 28 U.S.C. § 2254 challenging his 2005 conviction for first-degree murder from the Circuit Court of Cook County, Illinois. R 1, 12. For the reasons discussed below, the Court denies the petition on the merits and declines to issue a certificate of appealability.

## I.  BACKGROUND[1]

Following a bench trial, McCoy was found guilty of first-degree murder in connection with the fatal shooting of Jovan Day in the early morning hours of March 2, 2000. R. 24-1 at 1, *People v. McCoy*, No. 1-06-3473 (Ill. App. Ct. Feb. 29, 2008); *see also* R. 24-27 at 32–46. The evidence presented at trial is summarized as follows.

---

[1]The following facts are drawn from the state court record, R. 24, including the state appellate court's opinions on direct appeal and post-conviction appeal. *See* R. 24-1 at 1–7) (*People v. McCoy*, No. 1-06-3473 (Ill. App. Ct. 2008)); *People v. McCoy*, No. 1-09-3407, 2011 WL 10068714 (Ill. App. Ct. June 15, 2011); *People v. McCoy*, 2017 IL App (1st) 160221-U; *People v. McCoy*, 2019 IL App (1st) 182393-U. The state court's factual findings are presumed correct unless McCoy rebuts this presumption by clear and convincing evidence. *Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020) (citing 28 U.S.C. § 2254(e)(1); *Perez-Gonzalez v. Lashbrook*, 904 F.3d 557, 562 (7th Cir. 2018)).

*State's Case-in-Chief*

The State's key witnesses were Anthony Phillips and Thurman Wade, two eyewitnesses who were with McCoy and Day (the victim) at the time of the murder. *People v. McCoy*, 2019 IL App (1st) 182393-U, ¶¶ 5, 17. Phillips testified that they were driving around in McCoy's white-colored car—Phillips sat in the backseat with Wade, while Day sat in the front passenger seat next to McCoy. *Id.* ¶ 17.

Phillips explained that McCoy and Day drank gin out of plastic cups as McCoy drove. *Id.* After they finished the bottle, Day vomited on himself, and McCoy pulled over. *Id.*; R. 24-24 at 64–65. Day took off his jacket and tossed it onto the hood of the car while he removed his shirt. R. 24-24 at 65–66. Phillips explained that the jacket made a "thump" noise when it hit the car like it had something heavy in the pocket. *Id.* at 65. The noise prompted McCoy to ask Wade if the victim was "cool," which Phillips interpreted as McCoy being "worried" about what Day was carrying (presumably, concerned about whether he had a gun). *Id.* at 66. According to Phillips, Wade reassured McCoy that Day was "cool." *Id.*

Day returned to the front passenger seat shirtless, tossing his clothing by his feet. *Id.* at 65–67. McCoy continued driving while asking Day about names tattooed on his body. *Id.* at 67–68. McCoy commented: "I remember that person, rest in peace person, rest in peace this, rest in peace that." *Id.* at 67. According to Wade's testimony, Day gave McCoy a "look like he didn't want to talk about it." R. 24-25 at 20. McCoy then asked if anyone wanted "to smoke some more weed, marijuana." R. 24-24 at 68. Day responded yes, and they drove to a house where McCoy got out of

the car, entered the house, and returned 15 minutes later saying, "[his] guy didn't have no weed." *Id.* at 68–70 (quote on 70).

The foursome continued driving around for another 30 minutes when McCoy announced he was too drunk to continue and asked Day to take over. *Id.* at 70–72. After they exited the vehicle, Phillips heard a "pow" and looked up to see McCoy pointing a silver automatic handgun at Day. *Id.* at 72–73. He observed McCoy fire four more shots. *Id.* at 72. After Day collapsed, McCoy attempted to shoot him again, but the gun "clicked" and did not discharge. *Id.* at 74–75. Phillips watched as McCoy stomped on Day's head. *Id.* at 75. McCoy eventually returned to the car, drove to Wade's house, disposed of Day's clothing, and dropped Phillips and Wade off. *Id.* at 79–81. Phillips did not report the incident to the police out of fear of retaliation, but cooperated with their investigation and identified McCoy as the murderer from a line-up in 2004. *Id.* at 82–83.

Wade testified consistently with Phillips, explaining that McCoy and Day drank gin in plastic cups in the front seat, while Phillips and Wade rode in the back. *McCoy*, 2019 IL App (1st) 182393-U, ¶ 17; R. 24-25 at 11–13. As they drank, Wade explained that McCoy and Day were toasting to their new friendship after McCoy reassured Day that he had no problem with him. R. 24-25 at 14–15. According to Wade, Day had thought McCoy had a problem with him because he always had a "mean mug" when he saw him. *Id.*

Like Phillips, Wade testified that after Day vomited on himself, McCoy pulled over, Day got out, took off his jacket, and tossed it on the hood of the car. *McCoy*, 2019

3

IL App (1st) 182393-U, ¶ 17; R. 24-25 at 16–17. The jacket made a noise when it landed, and McCoy asked Wade if Day had a gun. R. 24-25 at 16–17. Wade answered no. *Id.* at 17. Day returned to the car and rode shirtless for the remainder of the drive. *Id.* at 18. They stopped again when McCoy asked Day to drive because he was too drunk. *Id.* at 22–23. Before exiting the vehicle, McCoy turned to Wade and stated: "I am fin' to kill this nigg--." *Id.* at 25–26. At the time, Wade did not realize McCoy was talking about Day. *Id.*

As McCoy and Day walked around the front of the car to trade places, Wade observed McCoy shoot Day with a chrome, .380 automatic handgun. *Id.* at 26–27. Wade explained McCoy fired two shots in rapid succession at Day's chest, causing him to fall to the ground, followed by three more shots. *Id.* at 27–28; *McCoy*, 2019 IL App (1st) 182393-U, ¶ 17. After the gun started to "click," Wade observed McCoy stomp on Day's head. *McCoy*, 2019 IL App (1st) 182393-U, ¶ 17; R. 24-25 at 28–29. Once McCoy returned to the car, he drove to Wade's house, threw Day's jacket into a dumpster behind the house, and then dropped Phillips and Wade off in front. R. 24-25 at 31–32. Like Phillips, Wade later identified McCoy as the shooter from a lineup. *Id.* at 39–40.

The State's other evidence corroborated Phillips' and Wade's testimonies. *McCoy*, 2019 IL App (1st) 182393-U, ¶ 18. The police found Day shirtless with a plastic cup in his hand. *Id.* A second plastic cup was found at the crime scene with McCoy's fingerprints on it. *Id.* The medical examiner testified Day was shot five times, and the abrasions around his eye area were consistent with someone stomping

on his head. *McCoy*, 2019 IL App (1st) 182393-U, ¶ 18; R. 24-26 at 102–03. Four .38 caliber cartridge cases, all fired from the same gun, were found at the crime scene. *McCoy*, 2019 IL App (1st) 182393-U, ¶ 18; R. 24-25 at 165–66. Three bullets were recovered from Day's body, and a fired bullet and a fragmented bullet were recovered from the crime scene. *McCoy*, 2019 IL App (1st) 182393-U, ¶ 18; R. 24-25 at 97–98. The bullets were all fired from the same gun.[2] *McCoy*, 2019 IL App (1st) 182393-U, ¶ 18; R. 24-26 at 2–5.

### *Stipulation as to Defense Counsel's Testimony*

On the Friday before the start of McCoy's trial, defense counsel went to the jail alone to take a statement from Wade[3] after receiving information that the witness had information contrary to what he had given the State. R. 24-1 at 2; R. 24-29 at 149–54. The statement Wade provided said that he had been smoking embalming fluid on the day the victim was murdered. R. 24-29 at 151. Wade stated that in the past, embalming fluid made him hallucinate and forget things. *Id.* He believed it had similar effects on him on the night of the shooting and "gave [him] the image" that McCoy was the shooter. *Id.* He claimed, however, that McCoy could not have been the

---

[2]According to Wade's testimony, McCoy told him to get rid of the gun following the murder. R. 24-25 at 32–34. Wade hid the gun at a friend's house, but never saw it again. *Id.* at 34. Because the gun was never found, it could not be determined whether the bullets and cartridge casings were fired from the same firearm. *McCoy*, 2019 IL App (1st) 182393-U, ¶ 18 n.1; R. 24-26 at 5–6.

[3]At the time of trial, Wade was serving a twelve-and-a-half-year sentence for bank robbery in a federal prison in Kentucky. R. 24-25 at 4–5. He was at the Cook County Jail in order to testify at McCoy's trial. *Id.*

5

shooter because he was not in the vicinity. *Id.* Wade reduced his statement to writing and signed it. *Id.* at 151, 153.

On the morning of trial, defense counsel discussed Wade's statement with McCoy. R. 24-27 at 78. Counsel had a separate conversation with the prosecutor at which time he learned Wade had also written a letter to the State's Attorney's office regarding threats and harassment he was receiving from fellow inmates at his facility for testifying at McCoy's trial. *Id.* at 78–79; R. 24-29 at 39–41. Both attorneys presented the issue regarding Wade's statement and potential testimony to the trial court judge in chambers prior to the start of trial. R. 24-27 at 79. They discussed how to remedy the situation should Wade deviate from his statement, and orally agreed they could stipulate to counsel's testimony if needed. *Id.* at 79–80.

During defense counsel's cross-examination of Wade, the attorney tried to impeach his testimony regarding the identity of the shooter with his written statement. R. 24-1 at 3; R. 24-25 at 43. Wade admitted that he had written and signed the statement, but claimed he did so because defense counsel advised that he may avoid being called to testify if he gave a statement that asserted a different version of events. R. 24-25 at 45–62. He further claimed defense counsel told him what to write in the statement. *Id.*

Following Wade's testimony, defense counsel explained to McCoy that the witness had deviated from his statement and presented to McCoy two options to move forward: 1) request counsel withdraw so he can testify as a witness, or 2) consent to counsel's continued representation and offer a stipulation as to his testimony. R. 24-

6

27 at 80–85. Counsel further explained that the decision was McCoy's choice alone. *Id.* at 83. McCoy agreed to proceed by way of stipulation. *Id.* at 80–85. He signed the stipulation, acknowledging:

> Dwayne McCoy understands that this stipulation is being entered into so that his Attorney, Lawrence Vance, would not have to withdraw from the case in order to testify to present the evidence contained in this stipulation.

R. 24-29 at 157–58.

In addition to McCoy signing the stipulation, the trial court addressed McCoy directly about this decision and asked him if he understood the reasoning and significance behind the stipulation. R. 24-25 at 121–22); R. 24-26 at 39–42. McCoy confirmed his understanding that the stipulation was being offered so that his counsel would not have to withdraw, advised that he wanted to proceed by stipulation so that his attorney could continue to represent him, and acknowledged that these decisions were made freely and voluntarily. *Id.* Counsel therefore did not withdraw, and the stipulation was offered into evidence, along with a copy of Wade's written statement. R. 24-26 at 39–42.

### *McCoy's Defense*

McCoy called Cornell Owens to testify in his defense. *McCoy*, 2019 IL App (1st) 182393-U, ¶ 5. Owens testified that on the day of Day's murder, he was walking to a restaurant with a friend in the early morning hours when a young man standing at the corner of the street asked him for a cigarette. R. 24-26 at 45–48. He would later identify the young man as McCoy, though he did not know who McCoy was at the

time of the offense. *Id.* at 47–48. He gave McCoy a cigarette and continued toward the restaurant when another man ran out and started shooting at three men across the street. *Id.* at 48–49, 51–53. Owens saw one of the men, the shirtless one, fall to the ground. *Id.* at 53–54. He denied that the men had exited or were standing in front of a car at the time of the shooting. *Id.* at 71.

Owens did not report the shooting to the police. *Id.* at 57. Instead, he explained that he became involved in the case because he overheard a conversation between his niece and her friend, who was also a friend of McCoy's (possibly his girlfriend), four years later regarding the shooting. *Id.* at 61–65, 75–76. Without knowing who McCoy was or first seeing his picture, Owens claimed to know McCoy had been falsely accused of the murder because his niece described him as a light-skinned man, and he remembered the shooter as a dark-skinned man. *Id.* at 63–67. He agreed to testify for McCoy at the request of his niece and her friend. *Id.* at 58–59.

### State's Rebuttal

The State presented Kaya Washington as a rebuttal witness following Owens' testimony. *McCoy*, 2019 IL App (1st) 182393-U, ¶ 5. Washington, who was ten years old at the time of the offense, testified that she was awakened by the sound of a car screeching down the street. R. 24-26 at 125–27. She looked out her bedroom window and saw a white car pull up and a man with no shirt on "tumble" out of the vehicle on the passenger side. *Id.* at 127. Washington testified that she ducked down because she was scared and heard five or six gunshots a few seconds later. *McCoy*, 2019 IL App (1st) 182393-U, ¶ 5; R. 24-26 at 128. She waited a few minutes and looked out

8

the window again to see the police arrive and the man with no shirt on laying in the street, face down. R. 24-26 at 128–29. She did not observe any other people on the street at the time. *Id.* at 128. Washington identified no one, and her testimony apparently was presented to establish that the shooting occurred after a shirtless man exited a white car. *Id.* at 125–29.

### *Trial Court's Verdict*

In its ruling, the trial court determined Wade and Phillips were credible witnesses, but Owens was not. *McCoy*, 2019 IL App (1st) 182393-U, ¶ 5. Beyond the incredulous nature of Owens' testimony, the trial court found McCoy's theory of the case, in which he placed himself in the car, drinking and toasting with Day, "totally contradict[ed] the testimony of [Owens] who [didn't] even see a car." R. 24-27 at 39–42. The trial court found McCoy guilty of first-degree murder, noting the "truly [] overwhelming" evidence against him, including, "the absolutely compelling testimony" of Wade and Phillips, "coupled with all the evidence [that] corroborated exactly what they said, down to the number of shots, the thing about the glasses and the drinking and everything else, and then corroborated further by the testimony of . . . [Washington]." *Id.* at 45–46. McCoy was later sentenced to a prison term of 65 years. *McCoy*, 2019 IL App (1st) 182393-U, ¶ 5.

### *McCoy's Post-Trial Motion and Direct Appeal*

Following his conviction, McCoy obtained new counsel and filed a motion for a new trial arguing, *inter alia*, that trial counsel's conflict of interest, based on his failure to properly take a statement from Wade in the presence of someone who could

independently testify to the interview if needed (i.e., a prover), constituted ineffective assistance of counsel. R. 24-29 at 4–26. McCoy further argued his waiver of conflict-free counsel was invalid. *Id*. The trial court denied his motion, finding:

> [I]t was not ineffective assistance of counsel or error on the part of the trial court or denial of the defendant's right to a fair trial to allow his lawyer to cross examine Thurmond Wade [] for fifty full pages, who admitted making this prior inconsistent statement…and to stay on the case at the defendant's request with his oral and written consent or waiver of any conflict and to provide his testimony as to the circumstances surrounding this statement that the witness Wade made to him by way of stipulation and which testimony was duly considered…in evaluating the weight to be given to that statement by the witness, Thurmond Wade.

R. 24-27 at 162–63. McCoy's subsequent motion to reconsider was also denied. *See* R. 24-32 at 3–11); R. 24-28 at 167–76.

McCoy then filed a direct appeal, reasserting his claim that he was denied effective assistance of counsel where his attorney created a conflict of interest that McCoy did not validly waive. R. 24-12 at 21–35. The Illinois Appellate Court rejected McCoy's claim, R. 24-1 at 4–6, and affirmed his conviction. *Id*. at 7. He presented his conflict of interest claim to the Supreme Court of Illinois in a petition for leave to appeal (PLA), R. 24-5 at 1–11, which was denied. *People v. McCoy*, 902 N.E.2d 1088 (Table) (Ill. 2009).

### McCoy's Post-Conviction Proceedings

Following the completion of his direct appeal, McCoy filed a *pro se* post-conviction petition raising various claims, including a claim of ineffective assistance of counsel where his trial attorney failed to impeach Washington with prior

10

inconsistent statements she made to the police. R. 24-7 at 1–57. The state post-conviction trial court summarily dismissed his petition, R. 24-33 at 1–19, and McCoy appealed. R. 24-9 at 1–27. The state appellate court reversed and remanded the petition for further proceedings on McCoy's ineffective assistance claim. *People v. McCoy*, No. 1-09-3407, 2011 WL 10068714, at *2–3 (Ill. App. Ct. June 15, 2011).

On remand, McCoy's appointed counsel was granted leave to file a supplemental petition, which raised an additional claim alleging the State used perjured testimony from Washington at trial. R. 24-12 at 1–19. McCoy attached a notarized letter from Washington dated September 2014, as well as an affidavit that she executed in May 2015. *Id.* at 8–10. Both the letter and the affidavit alleged that police officers told Washington what to say during her testimony and threatened her with jail time if she did not comply. *Id.* In her letter, Washington explained that she was awoken to gunshots on the morning of the murder, but did not get out of bed to look out the window. *Id.* at 10. She provided a conflicting account in her affidavit wherein she alleged that she saw a car leaving the scene, but would not have been able to identify the color of the car due to her eyesight. *Id.* at 8.

The post-conviction trial court denied on the merits the ineffective assistance claim (the claim that was the purpose of the remand), but declined to address the perjured testimony issue as the court believed it lacked jurisdiction to consider a new claim. R. 24-14 at 57–64. McCoy appealed, *id.* at 1–32, and the Illinois Appellate Court again reversed and remanded, directing further proceedings on the perjured testimony claim. *People v. McCoy*, 2017 IL App (1st) 160221-U, ¶¶ 20, 22.

11

Following the second remand, the State filed a motion to dismiss McCoy's supplemental petition, which the post-conviction trial court granted. R. 24-18 at 40–47. The Illinois Appellate Court affirmed the trial court's dismissal, *McCoy*, 2019 IL App (1st) 182393-U, ¶ 26, and the Supreme Court of Illinois denied McCoy's counseled PLA. R. 24-21 at 1–23; *People v. McCoy*, 144 N.E.3d 1209 (Table) (Ill. 2020). McCoy then filed the instant habeas corpus petition. R. 12.

## II.  ANALYSIS

McCoy presents two claims to this Court in his § 2254 petition. Claim One asserts McCoy was denied effective assistance of counsel where his trial attorney created a conflict of interest by taking a statement from a State witness prior to trial without bringing an investigator or prover who could independently testify as to the meeting. *Id.* at 10. Claim Two alleges McCoy's due process rights were violated where the State knowingly used Washington's false testimony during its rebuttal. *Id.* at 11.

For claims adjudicated on the merits in state court, federal habeas relief may not be granted unless McCoy demonstrates the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or that the state court decision was "based on an unreasonable determination of facts in light of the record" before the state court. 28 U.S.C. § 2254(d); *see also Harrington v. Richter*, 562 U.S. 86, 99–100 (2011). "This is a 'difficult to meet,' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting

*Harrington*, 562 U.S. at 102; *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)); *see also Shinn v. Ramirez*, 142 S. Ct. 1718, 1731 (2022) ("The writ of habeas corpus is an extraordinary remedy that guards only against extreme malfunctions in the state criminal justice systems.").

Section 2254(d)'s deferential standard, however, applies "only to those issues the state court explicitly addressed." *Pruitt v. Neal*, 788 F.3d 248, 263 (7th Cir. 2015) (internal quotation marks and citations omitted). Where "no state court has squarely addressed the merits of a habeas claim," the issue is reviewed "*de novo* under the pre-AEDPA standard of 28 U.S.C. § 2243[,]" and this Court must "dispose of the matter as law and justice require." *Id.* (internal quotation marks and citations omitted).

"The operative decision under review is that of the last state court to address a given claim on the merits." *Harris v. Thompson*, 698 F.3d 609, 623 (7th Cir. 2012) (citing *Greene v. Fisher*, 565 U.S. 34, 40 (2011); *Garth v. Davis*, 470 F.3d 702, 710 (7th Cir. 2006)). In McCoy's case, the relevant decisions for this Court's consideration are the state appellate court's opinion on direct appeal, R. 24-1 at 4–6 (denying Claim One on the merits), and the state appellate court's opinion on post-conviction appeal following the second remand of his post-conviction petition. *McCoy*, 2019 IL App (1st) 182393-U, ¶¶ 16–26 (denying Claim Two on the merits). For the reasons discussed below, McCoy is not entitled to federal habeas corpus relief on either claim.

### A. Claim One: Ineffective Assistance Based on Counsel's Conflict of Interest

In Claim One, McCoy asserts an ineffective assistance of counsel claim, arguing his counsel provided constitutionally deficient assistance when he created a potential conflict of interest by taking a statement from Wade without a prover, thereby making counsel a potential witness in the case. R. 12 at 10. McCoy argues the potential conflict of interest evolved into an actual conflict during counsel's cross-examination when Wade claimed counsel told him what to write in his statement. *Id.* He further contends that, although the trial judge was informed about this situation before trial, McCoy did not learn of it until the third day of trial and thus was unable to make an informed, valid waiver of his right to conflict-free representation. *Id.*

As discussed above, McCoy's claim was rejected on the merits by the state appellate court on direct appeal, but was not part of McCoy's post-conviction petition, thus making the direct-appeal decision the relevant decision for this Court's § 2254(d) consideration. *See Harris*, 698 F.3d at 623. The state appellate court addressed McCoy's claim as a straightforward ineffective assistance challenge under *Strickland v. Washington*, 466 U.S. 668 (1984), without considering whether a conflict of interest existed or was validly waived. R. 24-1 at 4–6. But McCoy appears to have argued both conflict of interest and ineffective assistance in his brief on direct appeal, R. 24-2 at 29–35, which also appears to be how McCoy's § 2254 petition presents this claim. R. 12 at 10; *see also* R. 31 at 2–22) (McCoy's § 2254 reply). This opinion will thus address both arguments.

The Sixth Amendment guarantees the right to effective assistance of counsel and includes, as a "correlative right," representation that is free from conflicts of interest. *Wood v. Georgia*, 450 U.S. 261, 271 (1981) (citing *Cuyler v. Sullivan*, 446 U.S. 335 (1980); *Holloway v. Arkansas*, 435 U.S. 475, 481 (1978)); *see also Blake v. United States*, 723 F.3d 870, 880 (7th Cir. 2013). There are two approaches for analyzing ineffective assistance claims based on a conflict of interest. *See Blake*, 723 F.3d at 880; *Stoia v. United States*, 109 F.3d 392, 395 (7th Cir. 1997). The first is used for an "actual" conflict, i.e., a *Cuyler* claim, for which a limited presumption of prejudice applies. *Blake*, 723 F.3d at 880. The second approach is followed when there is no "actual" conflict of interest, for which an ineffective assistance analysis under *Strickland* applies. *Id.* Under the former, "[p]rejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland*, 466 U.S. at 692 (quoting *Cuyler*, 446 U.S. at 350); *see also Stoia*, 109 F.3d at 395. Where there is no "actual" conflict of interest, the latter approach applies, and "the defendant must carry the heavier burden" under *Strickland* and show "that counsel's representation fell below an objectively reasonable standard of care, and that there is a reasonable probability that but for counsel's unprofessional errors the trial outcome would have been different." *Freeman v. Chandler*, 645 F.3d 863, 869 (7th Cir. 2011) (citing *Strickland*, 466 U.S. at 687, 694).

The state appellate court, rather than determining whether an "actual" conflict existed, conducted a straightforward *Strickland* analysis, and concluded that McCoy

15

could not establish prejudice since his attorney was able to both continue representing McCoy and offer his testimony by stipulation to impugn Wade's statement. R. 24-1 at 4–6. Because the conflict-of-interest issue was never "squarely addressed" by any state court,[4] the Court must apply a *de novo* standard of review to this part of the analysis.[5] *Pruitt*, 788 F.3d at 263.

An "actual" conflict of interest triggering *Cuyler* typically arises in cases involving joint representation where the attorney represents competing interests. *United States v. Lewisbey*, 843 F.3d 653, 657 (7th Cir. 2016). "[B]ut a conflict may

---

[4]When addressing McCoy's motion for a new trial, the state trial court, like the state appellate court, never determined if an actual conflict of interest existed. Although the trial court used the terms "potential" and "actual" conflicts, it did so to distinguish between the potential issue that would arise if Wade deviated from the written statement, and the materialization of that concern during Wade's testimony. *See* R. 24-27 at 157–63.

[5]Respondent argues that the Court should not reach the merits of any potential *Cuyler* claim because McCoy did not fairly present the issue to each level of state court review. R. 23 at 21–22); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (Illinois prisoners must invoke "one complete round of the State's established appellate review process," including a PLA to the state supreme court, before presenting their claims to the federal courts). Respondent contends McCoy made passing reference to *Cuyler* in his direct appeal, and only raised a *per se* conflict of interest claim under Illinois law in his direct appeal PLA. R. 23 at 21–22. "The *per se* standard (which presumes prejudice) and the *Cuyler* standard (which creates only a limited presumption of prejudice) are simply two different legal standards for conflict of interest claims…Illinois courts apply the *per se* standard to conflict of interest claims other than those involving multiple representation, whereas [the Seventh Circuit] and several [] sister circuits apply the *Cuyler* standard to any type of conflict of interest claim." *United States ex rel. Duncan v. O'Leary*, 806 F.2d 1307, 1313 (7th Cir. 1986). In both his direct appeal and direct appeal PLA, McCoy maintained that his counsel was ineffective for laboring under an "actual" conflict of interest arising from his solo pre-trial interview with Wade. R. 24-2 at 21–35); R. 24-5 at 3–11. He presents the same claim to this Court on federal habeas review. R. 12 at 10; R. 31 at 2–22. The Court therefore rejects Respondent's argument that his "actual" conflict of interest argument is procedurally defaulted. Further briefing on the issue, however, is not necessary because, as explained herein, McCoy cannot establish a *Cuyler* "actual" conflict of interest claim.

also arise 'when a client's interest conflicts with that of his attorney.'" *Id.* (quoting *United States v. Ellison*, 798 F.2d 1102, 1106-07 (7th Cir. 1986)); *see also Blake*, 723 F.3d at 880 ("*Cuyler*, applies 'if the defense counsel was faced with a choice between advancing his own interests above those of his client.'") (quoting *Hall v. United States*, 371 F.3d 969, 973 (7th Cir. 2004) (citing *Stoia*, 22 F.3d at 771)). But even where an attorney labors under competing interests, a defendant must demonstrate an adverse effect on his attorney's representation before the limited presumption of prejudice applies. *See Blake*, 723 F.3d at 880. To show an adverse effect, McCoy must demonstrate "'a reasonable likelihood that his counsel's performance would have been different had there been no conflict of interest.'" *Id.* (quoting *Hall*, 371 F.3d at 974). Although this standard requires a reasonable probability, just as *Strickland*'s prejudice prong requires, the focus is different insofar as the *Cuyler* approach looks at whether the conflict affected the attorney's performance before presuming prejudice, while the straightforward *Strickland* approach addresses whether an attorney's error adversely affected the defendant's case. *See Strickland*, 466 U.S. at 692–93 (explaining the different approaches).

McCoy's conflict-of-interest claim does not fall within the *Cuyler* framework. Although he argues counsel's loyalty was divided between "protecting himself from being accuse[d] of unethical behavior and his client's constitutional right" to conflict-free counsel, R. 31 at 22, an "actual" conflict is "more than a 'mere theoretical division of loyalties.'" *United States v. Fuller*, 312 F.3d 287, 291 (7th Cir. 2002) (quoting *Mickens v. Taylor*, 535 U.S. 162, 171 (2002)); *see also Mickens*, 535 U.S. at 174–75

(noting the language of *Cuyler* itself "does not clearly establish, or indeed even support" expansive application to "all kinds of alleged attorney ethical conflicts"); *Freeman*, 645 F.3d at 870 n.3 ("[A] criminal defendant's Sixth Amendment right to effective, conflict-free counsel is not coextensive with a defense attorney's ethical obligation to respond to—and avoid—conflicts.") (quoting John M. Burkoff, Criminal Defense Ethics, § 6.1 (2d ed. 2010) (internal quotation marks omitted)).

The record does not establish that McCoy and counsel's interests "actually" conflicted as *Cuyler* contemplates. Absence of a prover aside, counsel obtained a written, signed statement from Wade that indicated McCoy was not the shooter and was admissible as substantive evidence for the trial court to consider in evaluating Wade's credibility; counsel conducted an extensive cross-examination of Wade during which he admitted to writing the statement and signing it under penalty of perjury; and when Wade called into question the voluntariness of his statement, counsel offered a stipulation that impugned the witness's testimony on this point. Such actions, all of which were favorable to McCoy, do not suggest that counsel "actively represented conflicting interests," or was otherwise forced to choose between himself and McCoy. *See Freeman*, 645 F.3d at 869 (finding no "actual" conflict where counsel testified in petitioner's defense regarding an interaction with complaining witness); *Jones v. Butler*, 778 F.3d 575 (7th Cir. 2015) (applying straightforward *Strickland* analysis to ineffective assistance claim where defense counsel abandoned impeachment of state witness with prior inconsistent statement he received in pre-trial interview without a prover). And because counsel was able to complete the

18

impeachment of Wade through counsel's stipulated testimony and to continue representing McCoy, there is no "reasonable likelihood" that his performance would have been any different had there been no conflict. *Blake*, 723 F.3d at 880. Accordingly, McCoy cannot demonstrate either that his attorney labored under competing interests or that counsel's performance was adversely affected to establish an "actual" conflict of interest under *Cuyler*.

Even if there existed an "actual" conflict of interest, McCoy waived his right to conflict-free counsel. "A defendant who knowingly and intelligently waives his attorney's potential or actual conflict of interest may not, under any circumstances, later claim that such a conflict deprived him of his right to effective assistance." *Harvey v. McCaughtry*, 11 F.3d 691, 695 (7th Cir. 1993); *see also Freeman*, 645 F.3d at 868 ("[A] knowing and voluntary waiver of the right to conflict-free counsel is effective, and will foreclose later arguments premised on this right."). A court is not required to "follow some pre-ordained, detailed script when eliciting a criminal defendant's waiver of the Sixth Amendment right to conflict-free counsel." *United States v. Flores*, 5 F.3d 1070, 1078 (7th Cir. 1993). Rather, a waiver is valid where the defendant has "enough information about the conflict and its potential effects from which to make a rational choice with eyes wide open." *Gomez v. Ahitow*, 29 F.3d 1128, 1133-34 (7th Cir. 1994) (internal quotation marks and citations omitted).[6]

---

[6]Which standard of review—§ 2254(d)'s deferential standard of review or *de novo*—applies to this Court's consideration of whether McCoy waived his right to conflict-free counsel is unclear. The state trial court determined that McCoy validly waived the right. R. 24-27 at 154, 163. The state appellate court did not. R. 24-1 at 4–6. The Seventh Circuit has gone in

Defense counsel raised on the record that he discussed the consequences of Wade's testimony with McCoy at length and advised him as to the options available to him to proceed, including requesting counsel withdraw and take the stand or entering a stipulation as to counsel's testimony. R. 24-25 at 120–22. McCoy was informed of the contents of the stipulation, its legal significance, and the purpose it would serve in his case. R. 24-27 at 78–85. Before accepting McCoy's decision to proceed by way of stipulation, the trial court engaged him in a colloquy, advising him that Wade's testimony made counsel a potential witness in the case for which he may be obligated to withdraw and testify, and ensuring McCoy wanted counsel to remain on the case. R. 24-25 at 121–22. The trial court again admonished McCoy on his election to proceed by way of stipulation and forego requesting new counsel prior to admitting the stipulation into evidence at the close of the State's case-in-chief. R. 24-

---

different directions as to which standard applies when a trial court decides a federal claim, but the state appellate court, though presented with the claim, does not address it. *See Thomas v. Clements*, 789 F.3d 760, 766 (7th Cir. 2015) (declining to apply § 2254(d) deference to a claim addressed by the state trial court but not addressed by the state appellate court), *but see Atkins v. Zenk*, 667 F.3d 939, 944 (7th Cir. 2012) (applying § 2254(d) deference to a claim addressed "in one form or another" by both the state trial court and the state appellate court). In *Thomas*, the Seventh Circuit reiterated that "'[u]nless a state-court opinion adopts or incorporates the reasoning of a prior opinion, 'AEDPA generally requires federal courts to review *one* state decision,'" thereby resulting in *de novo* review of a claim unaddressed by the state appellate court. 789 F.3d at 766 (emphasis added) (quoting *Woolley v. Rednour*, 702 F.3d 411, 421 (7th Cir. 2012)). In *Atkins*, however, the Seventh Circuit applied § 2254(d) to both *Strickland* prongs, even though the last state court adjudicating the claim addressed only one prong. "The trial court addressed both deficient performance and prejudice, while the appellate court limited its analysis to deficient performance. Because both prongs have been addressed by Indiana state courts, in one form or another . . . § 2254(d) applies to both." 667 F.3d at 944. As noted above, however, this Court need not decide whether § 2254(d) applies to the state trial court's valid waiver determination since that determination was correct, and even under *de novo* review, this Court agrees with the state trial court and would find a valid waiver.

26 at 39–42. During each colloquy, McCoy reiterated that he wanted counsel to remain on the case and had no problem with the stipulation. R. 24-25 at 121–22); R. 24-26 at 39–42. Based on his representations, the stipulation was accepted, and counsel did not withdraw. R. 24-26 at 39–42.

Given these facts, McCoy's waiver, to the extent a conflict existed, was knowing and intelligent. Although McCoy argues that he lacked knowledge of the attorneys' pre-trial conference in chambers regarding Wade's written statement, he "cannot avoid his waiver because more information might have been available." *United States v. Lowry*, 971 F.2d 55, 62 (7th Cir. 1992) (citing *United States v. Colonia,* 870 F.2d 1319, 1327 (7th Cir. 1989) ("While more extensive discussions may be valuable and are encouraged, it suffices that a defendant know the character of the risks at stake and proceed with his eyes open.")). McCoy was aware that Wade's testimony created a situation in which counsel became a witness, and he knew that he had the option of requesting that counsel withdraw and testify. He instead opted for the presentation of counsel's stipulated testimony so that counsel could continue representing him, a choice that was repeatedly affirmed on the record. R. 24-25 at 121–22); R. 24-26 at 39–42. McCoy's waiver was therefore valid, and the trial court was reasonable in reaching this conclusion. *See Gomez*, 29 F.3d at 1133–34. Thus, even if an "actual" conflict existed, McCoy validly waived his right to conflict-free representation. For all the above stated reasons, he cannot establish a Sixth Amendment violation based on a conflict of interest.

21

Returning to the claim that the state appellate court addressed—ineffective assistance of counsel—the state appellate court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law. The state appellate court correctly cited the *Strickland* standard, noting McCoy must show "counsel's performance fell below an objective standard of reasonableness," and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." R. 24-1 at 4) (citing *Strickland*, 466 U.S. at 694). Addressing only *Strickland*'s prejudice prong, the state appellate court determined that, even if counsel was constitutionally deficient in failing to use a prover or failing to withdraw to testify as a witness against Wade, McCoy could not establish a reasonable probability the outcome of his trial would have been different. *Id.* at 5–6.

> Here defense counsel did testify as to the stipulation. Thus the defendant cannot sufficiently show that had his attorney withdrawn so that he could take the stand and testify, a reasonable probability exists that the outcome of his trial would have been different…Moreover, the defendant cannot demonstrate that he suffered any prejudice because [counsel's] testimony was admitted into evidence.

*Id.* Declining to decide *Strickland*'s performance prong and instead addressing only the prejudice prong is perfectly acceptable. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697.

Respondent directs the Court's attention to *Jones v. Butler*, 778 F.3d 575 (7th Cir. 2015), wherein the Seventh Circuit addressed a similar issue to the one raised

22

by McCoy. R. 23 at 23. In *Jones*, the petitioner's counsel had a telephone conversation with a state witness prior to trial. 778 F.3d at 584. Because counsel was the only witness to their conversation, he was forced to abandon his impeachment of the witness at trial when she denied making certain statements during their phone call. *Id.* Although the Seventh Circuit found counsel's performance was constitutionally deficient in failing to anticipate the predicament that could arise in interviewing a state witness solo (i.e., being forced to choose between withdrawing to serve as a witness or forgoing impeachment), it held that the petitioner was not prejudiced by counsel's failure to impeach given the considerable evidence supporting a guilty verdict. *Id.* at 585.

Defense counsel here, like the one in *Jones*, arguably failed to consider the consequences of obtaining a statement from Wade without a prover. But for more reasons than existed in *Jones*, McCoy cannot show prejudice. Unlike *Jones*, Wade's statement was reduced to writing and signed under penalty of perjury, counsel was not forced to abandon any lines of questioning during his cross-examination (the trial court in fact commented that counsel's "cross-examination of Thurmond Wade…covers fifty, fifty pages of transcript and was an excellent, excellent cross examination of a witness, in my opinion, thorough"), and counsel provided testimony by way of stipulation that discredited Wade's allegations as to the context in which his statement was obtained. R. 24-27 at 157–58. In offering the stipulation, McCoy's counsel was able to both complete the impeachment of Wade and avoid withdrawing from the case, and the trial court was able to consider the stipulation when

23

determining the weight to be given to Wade's statement. There was also no risk that use of the stipulation would confuse the jury, as McCoy had a bench trial. *See Freeman*, 645 F.3d at 870. Further, Phillips' identification of McCoy as the shooter was uncontested at trial and was corroborated by other evidence at the crime scene, including the location and state of the victim's body, the number of gunshot wounds, the abrasions to the victim's face, and McCoy's fingerprints on the plastic cup.

Thus, even if counsel's performance did fall below an objectively reasonable standard (possibly when he took Wade's statement without a prover), McCoy cannot establish a reasonable probability that the outcome of his trial would have been different. *See Strickland*, 466 U.S. at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome."). Given the admission of the stipulation coupled with the wealth of evidence against McCoy, the state court's determination of no *Strickland* prejudice was not unreasonable. *See Corcoran v. Neal*, 783 F.3d 676, 683 (7th Cir. 2015) ("[U]nreasonable [for § 2254(d)] means more than just incorrect; it means…lying well outside the boundaries of permissible differences of opinion.") (internal quotation marks and citations omitted). Claim One is denied.

### B.    Claim Two: Use-of-Perjured-Testimony Claim

In Claim Two, McCoy contends his due process rights were violated when the State knowingly used Washington's false testimony at trial. R. 12 at 11. McCoy argues that Washington's allegations in her 2015 affidavit demonstrate the police had reason to know she testified falsely, and that knowledge was imputed to the State. *Id.* The state appellate court rejected McCoy's use-of-perjured testimony claim

24

on post-conviction appeal, *see McCoy*, 2019 IL App (1st) 182393-U, ¶¶ 14–21, making it the relevant decision for this Court's review under § 2254(d). *See Harris*, 698 F.3d at 623.

"[D]ue-process rights are violated when the government obtains a conviction through the knowing use of false testimony." *United States v. Hilliard*, 851 F.3d 768, 782 (7th Cir. 2017) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). "Under *Napue*, a petitioner must show that: 1) the prosecution's case included perjured testimony; 2) the prosecution knew, or should have known, of the perjury; and 3) there is any likelihood that the false testimony could have affected the judgment of the jury." *Ashburn v. Korte*, 761 F.3d 741, 757 (7th Cir. 2014) (internal quotation marks and citation omitted).

The state appellate court, accepting the well-pleaded facts in Washington's notarized letter and affidavit as true, found the State knew Washington provided false testimony based on her description of the police officers' coercion during their interview. *McCoy*, 2019 IL App (1st) 182393-U, ¶¶ 11, 13–15. The court, however, concluded McCoy could not establish *Napue*'s materiality prong, and therefore rejected his claim. *Id.* ¶ 21.

With respect to the materiality prong of use-of-perjured-testimony claims, courts employ "a strict standard of materiality, not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." *United States v. Agurs*, 427 U.S. 97, 104 (1976). The applicable test asks whether "there is any reasonable likelihood that

25

the false testimony could have affected the judgment of the jury." *Id.* at 103; *see also Ashburn*, 761 F.3d at 758 ("[T]he alleged perjured testimony must bear a direct relationship to the defendant's guilt or innocence.") (internal quotation marks and citations omitted). If answered in the affirmative, the conviction must be set aside. *Agurs*, 427 U.S. at 104. "As the Supreme Court has held, this standard of materiality is equivalent to the *Chapman v. California*, 386 US. 18, 24, 87 S. Ct. 824, 17 L.E.2d 705 (1967), 'harmless beyond a reasonable doubt' standard." *Tayborn v. Scott*, 251 F.3d 1125, 1131 (7th Cir. 2001) (quoting *United States v. Bagley*, 473 U.S. 667, 669 n.9 (1985)).

The state appellate court, though exclusively citing state cases, correctly stated the constitutional standard for evaluating *Napue*'s materiality prong:

> A conviction obtained by the knowing use of false testimony must therefore be set aside only if there is a reasonable likelihood that the false testimony could have affected the verdict. This standard is equivalent to the harmless error standard. Under such a standard, a petitioner is not entitled to an evidentiary hearing where the evidence was overwhelming or the challenged testimony was not crucial to the State's case.

*McCoy*, 2019 IL App (1st) 182393-U, ¶ 15 (citing *People v. Olinger*, 680 N.E.2d 321, 348 (Ill. 1997) (relying on *Bagley*, 473 U.S. at 678-80 to explain *Napue*'s materiality prong)); *see also Hanson v. Beth*, 738 F.3d 158, 163 (7th Cir. 2013) ("[T]he Supreme Court has said that a state court does not need to cite, or even be aware of, its precedents 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'") (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)).

26

In rejecting McCoy's claim, the state appellate court concluded Washington's testimony was minimally relevant in the State's case against McCoy and, thus, there was no "reasonable likelihood" that her testimony "affect[ed] the trial court's judgment." *McCoy*, 2019 IL App (1st) 182393-U, ¶¶ 16–21. This determination was neither an unreasonable application of *Napue*, nor an unreasonable determination of facts in light of the record. *See* § 2254(d).

In issuing its verdict, the trial court thoroughly explained its reasons for finding McCoy guilty. *See* R. 24-27 at 32–46. As the trial court's findings make clear, the trial court relied upon the testimonies of Phillips and Wade in reaching its verdict. *Id.* The trial court emphasized Phillips' and Wade's mannerisms when testifying, their relationship with McCoy, the detail they provided, the minimal differences in their accounts of the murder, and "the sheer believability that they oozed from the witness stand." *Id.* at 32–39, 45. Beyond their credibility, Phillips' and Wade's testimonies were also well supported by the physical evidence: the shirtless victim, the number of gunshot wounds, the abrasions on the victim's head, the ballistic evidence, and the plastic cups found at the scene. *Id.* at 43–44, 45–46.

The extent to which Washington's testimony was noted by the trial court (and the only apparent purpose for which her testimony seems to have been offered), was to show additional evidence that a shooting occurred shortly after a shirtless man emerged from a white car. *Id.* at 43. But it is clear, based on the trial court's explanation prior to issuing its verdict, that the trial court's finding of guilt had little to do with Washington's circumstantial testimony. As the trial court stated: "the

27

evidence in [McCoy's] case [wa]s truly overwhelming." *Id.* at 46; *see also Griffin v. Pierce*, 622 F.3d 831, 943 (7th Cir. 2010) (rejecting false testimony claim as it was not essential given the "weighty evidence against [petitioner]"); *Ashburn*, 761 F.3d at 758 (rejecting perjured testimony claim, in part, because "the evidence against [petitioner] was overwhelming"). Accordingly, the state appellate court's rejection of McCoy's perjured testimony claim was not unreasonable under either § 2254(d)(1) or (2). Claim Two is denied.

For the reasons stated above, this Court cannot grant federal habeas relief for either of McCoy's claims. To the extent he requests an evidentiary hearing, R. 31 at 27, his request is denied as he cannot overcome the limitations of § 2254(d). *See Westray v. Brookhart*, 35 F.4th 737, 754 (7th Cir. 2022) ("no federal evidentiary hearing is permitted when the state court has already addressed the issue," and its adjudication was reasonable under § 2254(d)); *Stechauner v. Smith*, 852 F.3d 708, 722 (7th Cir. 2017) (only "'[i]f § 2254(d) *does not* bar relief, then an evidentiary hearing may be needed'") (quoting *Mosley v. Atchinson*, 689 F.3d 838, 844 (7th Cir. 2012) (citing *Pinholster*, 563 U.S. at 205–06) (Breyer, J., concurring in part and dissenting in part) (emphasis added)). McCoy's habeas corpus petition is denied.

## III.   CERTIFICATE OF APPEALABILITY AND NOTICE OF APPEAL RIGHTS

McCoy is advised that this is a final decision ending his case in this Court. If he wishes to appeal, he must file a notice of appeal in this Court within 30 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). He need not bring a motion to

reconsider this Court's ruling to preserve his appellate rights. However, if he wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). A Rule 59(e) motion must be filed within 28 days of the entry of this judgment, *see* Fed. R. Civ. P. 59(e), and suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). A Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi). Neither the time to file a Rule 59(e) motion nor the time to file a Rule 60(b) motion can be extended. *See* Fed. R. Civ. P. 6(b)(2).

The Court declines to issue a certificate of appealability. McCoy cannot make a substantial showing of the denial of a constitutional right, or that reasonable jurists would debate, much less disagree, with this Court's resolution of McCoy's claims. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

## IV. CONCLUSION

McCoy's habeas corpus petition, R. 1 and 12, is denied. Any pending motion is denied as moot. The Court declines to issue a certificate of appealability. The Clerk is instructed to: (1) terminate Respondent David Gomez and replace him with McCoy's current custodian, Sherwin Miles, Warden, Sheridan Correctional Center;

(2) alter the case caption to *McCoy v. Miles*; and (3) enter a judgment in favor of Respondent. Civil Case Terminated.

ENTERED:

Dated: April 19, 2023

FRANKLIN U. VALDERRAMA
United States District Judge